454 S.E.2d 77

**STATE of West Virginia ex rel. William A. ALLEN, Petitioner,**

v.

**Honorable Thomas A. BEDELL, Judge of the Circuit Court of Harrison County, Respondent.**

No. 22359.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 13, 1994.

Decided Dec. 9, 1994.

Concurring Opinion of Justice Cleckley, Jan. 6, 1995.

---

Jerald E., Jones, West & Jones, Clarksburg, for petitioner.

Jacquelyn I. Custer, Sr. Asst. Atty. Gen., Charleston, for respondent.

WORKMAN, Justice:

The Petitioner, William A. Allen (hereinafter "the Petitioner"), seeks a writ of prohibition against the Honorable Thomas A. Bedell, Judge of the Circuit Court of Harrison County. By order entered April 13, 1994, the lower court denied the Petitioner's motion to suppress the State's introduction of the results of a blood alcohol test administered upon the Petitioner by the United Hospital Center (hereinafter referred to as "UHC"). The Petitioner argues that the re-. sults of the blood test should have been ruled inadmissible and that hospital records relied upon by the State regarding the results of the blood testing should not have been available to the State. We find no error in the decisions of the lower court and hereby deny the requested writ of prohibition.

**I.**

On November 8, 1992, at approximately 12:17 a.m., the Petitioner was driving an automobile which veered off the highway and overturned. The Petitioner's stepbrother, a passenger in the vehicle, was killed as a result of the accident. The Petitioner was also injured in the accident and was transported to UHC. According to the Petitioner's treating nurse, Rosemary Cain, the Petitioner's treating physician ordered a blood sample as part of routine medical care and for diagnostic purposes. Ms. Cain also explained that because the odor of alcohol emanated from the Petitioner, standard hospital procedure indicated that a blood alcohol test be performed. According to Ms. Cain, the blood sample was drawn at 1:07 a.m. on November 8, 1992. The results of this test indicated that the Petitioner had a blood alcohol level of 0.14%.

At approximately 2:40 a.m., another blood sample was taken from the Petitioner by Ms. Cain at the direction of Deputy Kevin Haught of the Harrison County Sheriff's Department in conjunction with the issuance of a citation for driving under the influence of alcohol. This second blood sample was tested by the State Police Forensic Laboratory and was found to contain a blood alcohol level of 0.06%. When Deputy Haught requested this second test, he was unaware that UHC had already performed the first test. Deputy Haught also testified that the Petitioner had not been placed under arrest nor had any citation been issued at the time the first blood test was performed.

The Petitioner was subsequently charged with one count of causing a death while driving under the influence of alcohol in violation of West Virginia Code § 17C–5–2 (1991).[1] The Petitioner filed a motion to suppress, arguing that the results of the first blood test should be ruled inadmissible because the testing was not performed in compliance with West Virginia Code § 17C–5–4 (1991). A suppression hearing was held before the lower court on March 31, 1994, and evidence regarding the blood testing was in-

---

1. West Virginia Code § 17C–5–2 was amended in 1994; however, the amendments have no bear- ing on our decision in this matter.

troduced.[2] The lower court concluded that "the State may introduce proper testimony at trial with respect to the said United Hospital Center blood sample, but shall not seek the admission into evidence of any United Hospital Center documentation or other paperwork relative to that blood sample."

On appeal to this Court, the Petitioner contends that the lower court erred by (1) determining that the results of the Petitioner's first blood test were admissible at trial, and (2) permitting the State, during the suppression hearing, to use evidence obtained from the Petitioner's medical records.

## II.

The Petitioner contends that the first blood test was not performed in accordance with the requirements of West Virginia's implied consent statute, West Virginia Code § 17C–5–4, and that the trial court erred in ruling that the results of that test were admissible. West Virginia Code § 17C–5–4, in pertinent part, provides as follows:

> Any person who drives a motor vehicle in this state shall be deemed to have given his consent by the operation thereof, subject to the provisions of this article, to a preliminary breath analysis and a secondary chemical test of either his blood, breath or urine for the purposes of determining the alcoholic content of his blood. . . . A secondary test of blood . . . shall be incidental to a lawful arrest and shall be administered at the direction of the arresting law-enforcement officer having reasonable grounds to believe the person to have committed an offense. . . .

The statute also provides that refusal to submit to a secondary chemical test will result in license revocation for a period of at least one year and up to life. W.Va.Code § 17C–5–4.

In *State v. Cribb*, 310 S.C. 518, 426 S.E.2d 306 (1992), the treating physician of a defen-

dant hospitalized subsequent to an accident ordered a blood test. 310 S.C. at 519, 426 S.E.2d at 307. Shortly thereafter, the highway patrol officers arrived at the hospital and requested the defendant's treating physician to conduct a blood alcohol test. *Id.* at 520, 426 S.E.2d at 308. Rather than ordering a second blood sample, the physician ordered that a blood alcohol test be performed on the sample taken from the defendant. The officers later obtained an arrest warrant for the defendant based on the results of the blood alcohol test. *Id.* The *Cribb* court concluded that South Carolina's implied consent statute, almost identical to our section 17C–5–4, was inapplicable since an arrest had not been effected at the time the blood test for alcohol was performed. *Id.* The *Cribb* court reasoned that the legislature intended to limit the application of the implied consent statute to situations in which blood alcohol content was measured after an arrest had been effected. *Id.*

The Petitioner in the present case appears to imply that a blood test obtained outside the scope of section 17C–5–4 should be deemed inadmissible. We find no such conclusion implicit within the statute. Section 17C–5–4 simply authorizes a law enforcement officer to obtain a blood test incident to a lawful arrest where the officer has reasonable grounds to believe that the individual committed an offense and creates an administrative mechanism through which an individual's license may be revoked. The inclusion of such authorization within our statutory scheme certainly does not intimate a legislative intent to disallow in the criminal context evidence of alcohol content obtained by medical personnel in the course of treatment.

■ The Petitioner's first blood test was ordered by medical personnel for diagnostic purposes. He had not yet been charged with a crime, and the deputy had not even arrived

---

**2.** The Petitioner contends that the following facts adduced at the suppression hearing provide grounds for excluding the blood test from evidence: (1) the nurse who withdrew the blood failed to obtain the Petitioner's permission; (2) the blood sample was not taken at the direction of a police officer; (3) the Petitioner was not given the implied consent warning; (4) the Petitioner was not given an opportunity to consent or

refuse to submit to the blood test; (5) the Petitioner was not advised as to the purpose of the blood test; (6) the blood test was not taken incident to a lawful arrest; (7) the evidence failed to indicate that the Petitioner's skin was cleansed with a nonalcoholic antiseptic; and (8) the capability or reliability of the machine used by the UHC lab technician to calculate the percentage of blood alcohol was not established.

at the hospital to investigate the accident. Thus, West Virginia Code § 17C–5–4, which provides guidelines for the manner in which law enforcement officials shall obtain blood alcohol tests, has no application to the facts in this case and does not serve as a prohibition to admissibility. West Virginia Code § 17C–5–4 does not govern the admissibility of the results of a diagnostic blood alcohol test conducted prior to the arrest of a defendant and at the direction of a defendant's treating physician or other medical personnel.[3]

### III.

The Petitioner also contends that the lower court erred in allowing the treating nurse to testify at the suppression hearing regarding information contained in the Petitioner's hospital records and that such testimony violated a qualified privilege established by West Virginia Code § 57–5–4d (Supp.1994).[4] The Petitioner further maintains that the State has no right to obtain or introduce the medical records.

■ Upon review of West Virginia Code §§ 57–5–4a to –4j (Supp.1994), we conclude that the objective of these provisions is the establishment of guidelines for hospitals regarding the proper method for furnishing subpoenaed hospital records. West Virginia Code § 57–5–4d does direct the judge or court to "first ascertain that either: (1) The records have been subpoenaed at the insistance (sic) of the patient involved or his counsel of record; or (2) the patient involved or someone authorized in his behalf to do so for him has consented thereto and waived any privilege of confidence involved[,]" prior to opening sealed hospital records. However, nothing in section 57–5–4d should be interpreted to limit the State's subpoena power over medical records, nor should that section be considered tantamount to a physician/pa-

tient privilege. We have no statutory scheme establishing a physician/patient privilege, nor has this Court judicially recognized such a privilege.

Even in some jurisdictions which recognize a physician/patient privilege pursuant to Rule 503 of the Uniform Rules of Evidence, only confidential disclosures by the patient have been protected by the privilege, thus permitting introduction of routine blood tests evidencing intoxication. *Oxford v. Hamilton,* 297 Ark. 512, 763 S.W.2d 83 (1989). In *Oxford,* where a motorist brought a civil action against an individual allegedly driving under the influence of alcohol, the court ruled that blood test results indicating intoxication were admissible despite the applicability of Rule 503 of the Arkansas Rules of Evidence providing a physician/patient privilege. *Id.* at 514, 763 S.W.2d at 84; *see* Edward W. Cleary, *McCormick on Evidence* § 105, at 258–60 (3rd ed.1984); 8 John H. Wigmore, *Evidence in Trials at Common Law* § 2380a, at 828–32 (McNaughton Rev.1961). The Arkansas court reasoned that the physician/patient privilege is designed to protect only confidential communication between the patient and his physician and is not intended to shield the patient from disclosure of medical records devoid of confidential communication. *Oxford,* 297 Ark. at 514, 763 S.W.2d at 84; *see also McVay v. State,* 312 Ark. 73, 847 S.W.2d 28 (1993).

Other jurisdictions have rationalized the introduction of evidence of intoxication contained in medical records under the exception to the hearsay rule for "[r]ecords of [r]egularly [c]onducted [a]ctivity." *See* W.Va.R.Evid. 803(6). In *Andres v. Gilberti,* 592 So.2d 1250 (Fla.Dist.Ct.App.1992), for example, a bicyclist brought a personal injury action against a motorcyclist allegedly driving under the influence. *Id.* at 1251. A

---

3. There is apparently no dispute that the second test was in compliance with West Virginia Code § 17C–5–4, and that the Petitioner signed a written consent authorizing the deputy to take the second blood sample.

4. West Virginia Code § 57–5–4d provides, in pertinent part, that when dealing with sealed hospital records

[b]efore directing that such inner-envelope or wrapper be opened, the judge, court, officer, body or tribunal shall first ascertain that either: (1) The records have been subpoenaed at the insistance (sic) of the patient involved or his counsel of record; or (2) the patient involved or someone authorized in his behalf to do so for him has consented thereto and waived any privilege of confidence involved.

blood alcohol test performed in the emergency room immediately after the accident as standard procedure was ruled admissible under the "records of regularly conducted activity" exception to the hearsay rule, Section 90.803(6), Florida Statutes (1987). *Id.*

In *Commonwealth v. Dube,* 413 Mass. 570, 601 N.E.2d 467 (1992), a defendant seeking exclusion of blood test results argued that the release of medical records violated his right to privacy. *Id.* at 572, 601 N.E.2d at 468. The blood test in *Dube* had been conducted in the course of routine treatment of the defendant during his hospitalization after the accident. *Id.* The Massachusetts court ruled that the admission of hospital records "for the purpose of showing that a criminal defendant had consumed intoxicating liquor shortly before events that led to a charge of operating a motor vehicle while under the influence of intoxicating liquor" had been admissible for "more than a decade" and would be admitted in *Dube. Id.* at 574, 601 N.E.2d at 469. Concluding that no violation of privacy had occurred, the court similarly found no impediment to the introduction of the incriminating blood test evidence. *Id.*

The blood tests in the present case were ordered by the medical personnel attending to the Petitioner subsequent to the accident. Such tests are not subject to exclusion based upon lack of conformity to the administrative requirements of West Virginia Code § 17C–5–4, and the hospital records evidencing the blood results are not subject to exclusion based upon any regulatory scheme for the handling of hospital records. We conclude that medical records containing the results of blood alcohol tests ordered by medical personnel for diagnostic purposes are subject to subpoena and shall not be deemed inadmissible by virtue of the provisions of West Virginia Code § 57–5–4d.

 As we have often recognized, " '[r]ulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion.' *State v. Louk,* [171] W.Va. [639, 643], 301 S.E.2d 596, 599 (1983)." Syl.Pt. 2, *State v. Peyatt,* 173 W.Va. 317, 315 S.E.2d 574 (1983). We find no abuse of discretion, and the Petition-

er's request for a writ of prohibition is hereby denied.

Writ denied.

MILLER, J., Retired, sitting by temporary assignment.

BROTHERTON, C.J., did not participate.

CLECKLEY, J., concurs, and reserves the right to file a concurring opinion.

CLECKLEY, Justice, concurring:

I believe the majority made two errors regarding appellate review. This petition should have been dismissed as improvidently granted simply because it was not ripe for our consideration. The " '[l]iberal allowance' " of extraordinary writs " 'degrades the prominence of the trial' " and it undermines our statutory provisions limiting appellate review to final judgments. *Brecht v. Abrahamson,* ── U.S. ──, ──–──, 113 S.Ct. 1710, 1720–21, 123 L.Ed.2d 353, 371 (1993), *quoting Engle v. Isaac,* 456 U.S. 107, 127, 102 S.Ct. 1558, 1571, 71 L.Ed.2d 783, 800 (1982). More importantly, the majority opinion adds to the mass of legal confusion in this State when it engages in a lengthy and unnecessary discussion of the physician-patient privilege. Because neither of these errors was outcome determinative, I concur.

## I.

### Writs of Prohibition

This petition for a writ of prohibition should not have been reviewed by this Court. The writ of prohibition is a creature of common law. "The writ of prohibition is purely jurisdictional; it does not lie to correct mere errors." *State ex rel. City of Huntington v. Lombardo,* 149 W.Va. 671, 679, 143 S.E.2d 535, 541 (1965). The rationale behind a writ of prohibition is that by issuing certain orders the trial court has exceeded its jurisdiction, thus making prohibition appropriate.

Our earlier cases stated "neither the constitution nor the applicable statute enlarges or narrows the scope of the writ of prohibition as it was known at common law." *State ex rel. Miller v. Smith,* 168 W.Va. 745, 755,

285 S.E.2d 500, 505 (1981). (Citation omitted). Unfortunately, in West Virginia the writ of prohibition has been used with increasing frequency as a device to escape from the "final judgment" rule. When appropriate, writs of prohibition and mandamus provide a drastic remedy to be invoked only in extraordinary situations. "[O]nly exceptional circumstances amounting to a judicial 'usurpation of power' will justify the invocation of this extraordinary remedy." *Will v. United States*, 389 U.S. 90, 95, 88 S.Ct. 269, 273, 19 L.Ed.2d 305, 309 (1967). (Citation omitted). *See also Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988).

Mere doubt as to the correctness of a trial court's ruling on a motion *in limine* regarding an evidentiary issue is an insufficient basis to invoke this Court's writ power. To justify this extraordinary remedy, the petitioner has the burden of showing that the lower court's jurisdictional usurpation was clear and indisputable and, because there is no adequate relief at law, the extraordinary writ provides the only available and adequate remedy. Thus, writs of prohibition, as well as writs of mandamus and habeas corpus, should not be permitted when the error is correctable by appeal.

I believe that there are appropriate circumstances where a writ of prohibition or mandamus should be granted by this Court.

Perhaps our problem stems from the fact that we have not developed specific standards and guidelines to determine whether prohibition or mandamus is appropriate in a particular case. I believe as a starting point at least five questions must be asked:

1. Whether the party seeking the writ has other adequate means such as appeal to obtain the desired relief; [1]

2. Whether the damage (other than expense and time) or prejudice suffered by the petitioner is correctable on appeal;

3. Whether the circuit court's order is clearly erroneous as a matter of law; [2]

4. Whether the circuit court's order is an oft repeated error or manifests persistent disregard for the West Virginia Rules of Evidence, Rules of Criminal Procedure, or Rules of Civil Procedure; and

5. Whether the circuit court's order raises new and important problems or issues of law of first impression. [3]

*See* Fleming James, Jr., Geoffrey C. Hazard, Jr., & John Leubsdorf, *Civil Procedure* § 12.13 at 677 (3rd ed. 1992); *In re Cement Antitrust Litigation*, 688 F.2d 1297, 1301 (9th Cir.1982), *aff'd sub nom. Arizona v. United States District Court*, 459 U.S. 1191, 103 S.Ct. 1173, 75 L.Ed.2d 425 (1983). *See*

---

1. Therefore, we should not allow a writ of prohibition as a substitute for an appeal. *See County Court v. Boreman*, 34 W.Va. 362, 366, 12 S.E. 490, 492 (1890) ("But it does not lie for errors or grievances which may be redressed in the ordinary course of judicial proceedings, by appeal or writ of error"). Some of our clearest language came in *Woodall v. Laurita*, 156 W.Va. 707, 713, 195 S.E.2d 717, 720–21 (1973), where this Court stated "[t]hese motions necessarily involve the exercise of discretion, and the correctness of discretionary rulings should ordinarily be challenged at a time when the entire record is available to an appellate court. The piecemeal challenge of discretionary rulings through writs of prohibition does not facilitate the orderly administration of justice." Thus, in the absence of jurisdictional defect, the administration of justice is not well served by challenges to discretionary rulings of an interlocutory nature. These matters are best saved for appeal.

2. "[T]his Court will use prohibition in this discretionary way to correct only substantial, clear-cut, legal errors plainly in contravention of a clear statutory, constitutional, or common law mandate which may be resolved independently of any disputed facts and only in cases where there is a high probability that the trial will be completely reversed if the error is not corrected in advance." Syllabus Point 1, in part, *State ex rel. DeFrances v. Bedell*, 191 W.Va. 513, 446 S.E.2d 906 (1994), *quoting* Syllabus Point 1, *Hinkle v. Black*, 164 W.Va. 112, 262 S.E.2d 744 (1979).

3. As recently as 1980, this Court indicated it would not hear writs from interlocutory rulings on evidentiary rulings. In *State ex rel. Foster v. Luff*, 164 W.Va. 413, 419, 264 S.E.2d 477, 481 (1980), the Court observed that "it should be stressed that while we have accepted this issue under our original jurisdiction powers, this was done in order to resolve a substantial issue of considerable importance in the trial of criminal cases. In the future this type of issue like motion in limine rulings of a trial court are not reachable by an original writ of mandamus or prohibition." How quickly we forget.

*also Mallard v. United States District Court,* 490 U.S. 296, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989).

The majority chooses to review a pretrial ruling on an evidentiary issue, raised *in limine,* concerning a privilege that never has existed in this State's history, at least in courts of record. While the majority is writing an opinion that adds nothing substantial to West Virginia's jurisprudence, the trial is postponed and justice is delayed. Ultimately, we are told in the majority's opinion that evidentiary rulings are within the discretion of the trial court which is hardly an earthshaking revelation. What makes this case egregious is that the granting of the rule to show cause even is inconsistent with the liberal language of Syllabus Point 1 of *Hinkle v. Black,* 164 W.Va. 112, 262 S.E.2d 744 (1979) (writ of prohibition is to be used "to correct only substantial, clear-cut legal errors" and when there "is a high probability that the trial will be completely reversed if the error is not corrected in advance").[4]

The writ of prohibition in this case, as well as others, involves a perversion and exploitation of the concept of jurisdictional usurpation.[5] The loose language in cases such as *Hinkle, supra; McFoy v. Amerigas, Inc.,* 170 W.Va. 526, 532, 295 S.E.2d 16, 22 (1982), and *Naum v. Halbritter,* 172 W.Va. 610, 309 S.E.2d 109 (1983), has contributed to the erosion of the proper use of the writs.[6] I would overrule these cases as a necessary

---

**4.** The better position is stated in *State ex rel. Peacher v. Sencindiver,* 160 W.Va. 314, 316, 233 S.E.2d 425, 426 (1977), that "[w]e cannot issue prohibition when the action of the trial court could be attacked as an abuse of discretion[.]"

**5.** *See State ex rel. Chafin v. Halbritter,* 191 W.Va. 741, 448 S.E.2d 428 (1994) (granted prohibition because Court disagreed with trial court's ruling concerning "marital property"); *McDowell County Bd. of Educ. v. Stephens,* 191 W.Va. 711, 447 S.E.2d 912 (1994) (granted a rule to show cause to determine whether a lower court should have dismissed amended pleading); *State ex rel. Scales v. Committee on Legal Ethics,* 191 W.Va. 507, 446 S.E.2d 729 (1994) (granted prohibition to stop investigation of an attorney); *State ex rel. Erickson v. Hill,* 191 W.Va. 320, 445 S.E.2d 503 (1994) (granted prohibition to discovery order because it was abusive and oppressive); *State ex rel. Spaulding v. Watt,* 188 W.Va. 124, 423 S.E.2d 217 (1992) (prohibition granted to prevent defendant's release on bail); *State ex rel. Strickland v. Daniels,* 173 W.Va. 576, 318 S.E.2d 627 (1984) (granted writ to prohibit magistrate from removing only part of case to circuit court); *Criss v. Salvation Army Residences,* 173 W.Va. 634, 319 S.E.2d 403 (1984) (granted prohibition because tenant may be evicted before full appeal).

**6.** The modern abuse of the writ of prohibition began in *Woodall v. Laurita,* 156 W.Va. 707, 712, 195 S.E.2d 717, 720 (1973), where a unanimous Court stated:

"In this case the defendant seeks to invoke prohibition on the grounds that the court has exceeded its legitimate powers, and not on the grounds of lack of jurisdiction. In this type of case the issuance of the writ is discretionary with the appellate court. Prohibition will issue only in *clear cases of abuse.*" (Emphasis added; citation omitted).

The only authority cited in *Woodall* for the proposition that this Court has "discretionary" authority to grant writs of prohibition is *Brown v.*

Arnold, 125 W.Va. 824, 26 S.E.2d 238 (1943). *Brown* not only does not support the *Woodall* contention, it expressly rejects it. The Court in *Brown* stated that it had been cited no cases and could not find any cases that permitted the granting of a writ of prohibition beyond what was provided for in W.Va.Code, 53–1–1 (1923), which states "'[t]he right of prohibition shall lie as *a matter of right in all cases of usurpation and abuse of power*[.]'" 125 W.Va. at 834–35, 26 S.E.2d at 243. (Emphasis added). In fact, the most poignant statement made in *Brown* was: "Judicial precedent in this jurisdiction precludes the use of the writ of prohibition as a means of correcting mere errors and irregularities in matters over which the inferior court has cognizance." 125 W.Va. at 839, 26 S.E.2d at 245.

Of course, this Court did not stop with *Woodall.* We added other reasons not supported by precedent or statute to justify our intervention into lower court's rulings on interlocutory matters. In *Naum, supra,* we stated that the granting of a writ of prohibition was based on political harm to a prosecutor that was certain to occur during the period when his appeal was maturing for consideration. Further, this Court relied on the concept of judicial economy by stating that "allowing the trial to go through to its conclusion would be an exercise in futility, wasting both the trial court's time and the state's resources." 172 W.Va. at 613, 309 S.E.2d at 112. In *McFoy v. Amerigas, Inc.,* 170 W.Va. at 532, 295 S.E.2d at 22, we stated that "[o]ur modern practice is to allow the use of prohibition, based on the particular facts of the case, where a remedy by appeal is unavailable or inadequate, or where irremediable prejudice may result from lack of an adequate interlocutory review." (Citation omitted). Under the language of these cases, any serious procedural, evidentiary, or substantive law misadventure can be characterized as appropriate for prohibition and lawyers have resorted to this characterization with great affinity.

step in bringing the writ of prohibition back into proper focus.

I concede that some appellate review from lower courts' interlocutory rulings is necessary and helpful.[7] Undoubtedly, the writ procedure has introduced into West Virginia appellate practice a flexible device of practical utility:

> "The procedure is bounded by much stricter time limits than an appeal, involves a relatively simple record, concerns almost purely legal issues, and permits the appellate court to consider giving relief only in cases in which the application shows a strong justification for doing so. Nevertheless, the writ procedure would be unnecessary if 'ordinary' interlocutory review were less restricted in its availability."

Fleming James, Jr., Geoffrey C. Hazard, Jr., & John Leubsdorf, *Civil Procedure* § 12.13 at 678.

The solution, however, is for the legislature to expand the statutory opportunity for appeal in West Virginia, including appeals of some interlocutory rulings. Unquestionably, W.Va.Code, 58–5–1 (1925), is antiquated and in need of comprehensive and substantial revision. Although this Court has authority to accomplish some of the necessary reform through its rulemaking authority, I believe that revision is better undertaken by the legislature because the "right" and "scope" of appeal are matters of substantive law. Hopefully, the various bar associations in this State will give serious attention to recommendations concerning legislative and rule reform that would give this Court the same degree and flexibility that it has enjoyed under the writ practice. My general suggestion is that appellate review of some interlocutory rulings be allowed whenever the question presented is either of great practical importance in a particular case or of general importance as a matter of procedural law.

## II.

### Physician–Patient Privilege

After declaring that a physician-patient privilege has not been adopted in West Virginia, the majority in two pages goes on to imply what our ruling would be if we had one. This type of gratuitous dicta sends a mixed message to lawyers and to our lower tribunals.[8] I do not believe we should continue to discuss the physician-patient privilege as if we partially recognize it. To be clear and specific, there is no physician-patient privilege in West Virginia;[9] and, unless the legislature in its wisdom sees fit to adopt the privilege, we should not create one indirectly by implication.

As we do in this case, we have skirted dangerously on the edge of creating a physician-patient privilege by suggestion. In *King v. Kayak Manufacturing Corp.*, 182 W.Va. 276, 287, 387 S.E.2d 511, 522 (1989), we stated "[e]ven if we assume that such a privilege exists, the plaintiff waived it[.]" In *State v. Cheshire*, 173 W.Va. 123, 127, 313

---

7. *See State ex rel. Register–Herald v. Canterbury*, 192 W.Va. 18, 449 S.E.2d 272 (1994) (prohibition granted to reverse order constituting prior restraint against newspaper); *State ex rel. Tyler v. MacQueen*, 191 W.Va. 597, 447 S.E.2d 289 (1994) (prohibition used to review disqualification of prosecutor's office); *State ex rel. Leach v. Schlaegel*, 191 W.Va. 538, 447 S.E.2d 1 (1994) (prohibition granted to prevent relitigation of case which was foreclosed because of collateral estoppel); *State ex rel. DeFrances v. Bedell*, 191 W.Va. 513, 446 S.E.2d 906 (1994) (prohibition used to review decision on lawyer's disqualification).

8. Alternative holdings, as we have provided in this case, are nothing more than advisory opinions that solve questions that do not require answering in order to resolve the issues raised by the parties. As a practical matter, if the first answer is independently sufficient, then all that

follows is surplusage. Thus, the strength of the first makes all the rest dicta. It is perfectly understandable for the majority opinion to want to explain to the losing petitioner in this case that he was wrong as to whether a physician-patient privilege existed; and, even if one did exist, he was wrong as to its application. Nevertheless, while that explanation may comfort the party, it has the potential of creating new law in a strictly advisory fashion. *See Karsten v. Kaiser Foundation Health Plan of the Mid–Atlantic States, Inc.*, 36 F.3d 8 (4th Cir.1994). Thus, any treatment of the physician-patient privilege on the merits is nothing more than dicta, is unnecessary for the determination of this case, and is a path we should decline to tread.

9. *See State v. Simmons*, 172 W.Va. 590, 309 S.E.2d 89 (1983) (no physician-patient privilege in West Virginia); *Mohr v. Mohr*, 119 W.Va. 253, 193 S.E. 121 (1937) (accord).

S.E.2d 61, 67 (1984), we stated "[a]side from the issues of whether such privilege exists in a *criminal case* in this state, ... we question whether the consultation was performed on a private basis." (Emphasis added; citations omitted). In addition to these unfortunate and unnecessary excursions, recently, we added a physician-patient fiduciary relationship to our jurisprudence. *See Morris v. Consolidation Coal Co.*, 191 W.Va. 426, 446 S.E.2d 648 (1994); *State ex rel. Kitzmiller v. Henning*, 190 W.Va. 142, 437 S.E.2d 452 (1993). Although we have said there is not a physician-patient privilege, we have not come close to defining the limitations or parameters of this new physician-patient fiduciary duty. In *Kitzmiller*, 190 W.Va. at 144, 437 S.E.2d at 454, we stated:

> "As the hospital asserts, West Virginia has not codified a physician-patient privilege. However, the absence of such a privilege contemplates the release of medical information *only* as it relates to the condition a plaintiff has placed at issue in a lawsuit; it does not efface the highly confidential nature of the physician-patient relationship that arises by express or implied contract." (Emphasis in original).

In *Morris*, 191 W.Va. at 434–35, 446 S.E.2d at 656–57, we came even closer to adopting a physician-patient privilege:

> "Before *Kitzmiller, supra*, the physician-patient privilege was not recognized under common law in West Virginia.... We have acknowledged that '[t]he history of the common law is one of gradual judicial development and adjustment of the case law to fit the changing conditions of society.' ... Therefore, in *Kitzmiller* this Court, in order to meet the current social demands, recognized that there is a fiduciary relationship between a patient and a physician which prohibits the physician from divulging confidential information he has acquired while attending to a patient." (Citations omitted).

Although I would not have voted with the majority in *Kitzmiller*, I am not particularly troubled with a legal principle that merely states that nonjudicial expressions by a physician concerning the treatment of his or her patient constitute a violation of this new duty of confidentiality. The point must be made, however, that the adoption of this duty of confidentiality does not in any way regulate what may be testified to in judicial proceedings. Conversations between patients and physicians are not barred by either Rule 601 (general competency) or Rule 501 (privileges) of the West Virginia Rules of Evidence.[10] When a disclosure of information is sought and it is required by law or compelled by court order, usually only a privilege will protect against disclosure.

Under Rule 501 of the West Virginia Rules of Evidence, courts may recognize privileges

---

10. A rule that is designed to protect the confidence of a patient does not necessarily impede upon this State's Rules of Evidence regarding privileges. See *State v. Simmons, supra*, where Justice Miller discussed the difference between our statutory duty of confidentiality under W.Va. Code, 27–3–1, *et seq.*, and an evidentiary privilege. *See also State ex rel. Register–Herald v. Canterbury*, 192 W.Va. at 21–23, 449 S.E.2d at 275–77 (seems to limit statute's application to only situations where information is released by medical personnel). The duty of confidentiality is enforced independently of the law of evidence.

"In some respects the duty of confidentiality provides greater protection for privacy than an evidentiary privilege. A privilege applies only when testimony is sought in a legal proceeding, whereas the duty of confidentiality applies to prevent disclosure of secrets in extrajudicial settings as well." Christopher B. Mueller & Laird C. Kirkpatrick, *Evidence* § 5.2 at 335 (1994).

For example, all communications to an attorney by a client are not privileged, and an attorney may be called upon to testify regarding conversations that were not intended as confidential; but the confidentiality rule under our code of professional ethics may very well limit the attorney from disclosing the communications publicly. There are, however, some unique features of a privilege that are significant:

"Nonetheless, complete confidentiality can generally be guaranteed only if an evidentiary privilege also applies. In the absence of a privilege, a person called as a witness can normally be compelled to disclose confidential communications, regardless of any professional standard of confidentiality and regardless of what personal assurances or contractual commitments were given to the communicants." Christopher B. Mueller & Laird C. Kirkpatrick, *Evidence* § 5.2 at 336.

It is important for practicing physicians and attorneys to be instructed on this difference, so they know not to make a confidential commitment beyond that which the law of privileges permits.

only to the extent they exist under common law, statute, or the Constitution.[11] There is clear authority that this privilege is of a statutory origin and did not exist at common law. *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). "Despite the language to the effect that privileges 'shall be governed by the *principle* of common law,' it is contemplated that the courts will not adopt or permit a liberal expansion of the existing acknowledged privileges." 1 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 5–1(C)(2) at 472 (1994), *quoting,* in part, W.Va.R.Evid. 501. (Emphasis added). I believe it would be unwise both theoretically and practically to adopt a physician-patient privilege.

I concede that a majority of states have adopted the physician-patient privilege by statute. The irony is that all the jurisdictions that have adopted the physician-patient privilege also have adopted so many exceptions to its application that its scope is either significantly limited or the privilege has been completely abolished. In these jurisdictions, the privilege was adopted to facilitate the effective rendering of the professional service offered by a physician. *See* Franklin D. Cleckley, *A Modest Proposal: A Psychotherapist–Patient Privilege for West Virginia,* 93 W.Va.L.Rev. 1, 22–23 (1990). Thus, as the Supreme Court suggests in *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186, 195 (1980), the physician-patient privilege is based on the policy that "the physician must know all that a patient can articulate in order to identify and to treat disease[.]" I have serious reservation whether an evidentiary privilege is necessary to facilitate proper medical treatment. Indeed, a wise patient who wants to survive his or her current medical problems would have a natural incentive to disclose all relevant information when seeking medical treat-

ment.[12] Lastly, it must be remembered that the physician-patient privilege works both ways in the judicial system. *See* Ronan E. Degnan, *The Law of Federal Evidence Reform,* 76 Harv.L.Rev. 275, 300 (1962) (danger of privilege being used to block disclosures that could "defeat dishonest claims or defenses"). In *Baldrige v. Shapiro,* 455 U.S. 345, 362, 102 S.Ct. 1103, 1112–13, 71 L.Ed.2d 199, 212–13 (1982), the Supreme Court stated:

> "It is well recognized that a privilege may be created by statute. A statute granting a privilege is to be strictly construed so as 'to avoid a construction that would suppress otherwise competent evidence.' *St. Regis Paper Co. v. United States,* 368 U.S. 208, 218[, 82 S.Ct. 289, 295, 7 L.Ed.2d 240, 248 (1961) ] . . . .

> \* \* \* \* \* \*

> ". . . A finding of 'privilege,' however, shields the requested information from disclosure despite the need demonstrated by the litigant." (Footnote omitted).

Because privileges contravene the fundamental principle that "the public has a right to every [person's] evidence," courts should recognize them only when the parties make a convincing showing both that the interest is one which society values strongly and that a rule of privilege is necessary to foster that value. John H. Wigmore, *Evidence in Trials at Common Law* § 2258 (McNaughton rev. 1961).

The Scriptures state "if the trumpet does not sound a clear call, who will get ready for battle."[13] Appellate courts must speak with a clear voice. In this area, the message must be simple: There is no physician-patient privilege in West Virginia notwithstanding

---

11. As part of our obligation to protect important constitutional rights, this Court created a new limited journalistic privilege under our constitutional role as opposed to our rulemaking authority. *See State ex rel. Hudok v. Henry,* 182 W.Va. 500, 389 S.E.2d 188 (1989).

12. Dean Wigmore argued that the physician-patient privilege was unnecessary for several reasons. First, rarely will information given to a physician necessitate confidentiality. Second,

even though a few instances may arise when patient information would require confidentiality, it would be given to a physician in spite of the absence of a privilege. Third, less harm occurs to the physician-patient relationship than does to the judicial process in providing a privilege for the relationship. 8 John H. Wigmore, *Evidence* §§ 2380–2391 (McNaughton rev.1961).

13. 1 *Corinthians* 14:8 (New International Version 1985).

any of our past decisions or our adoption of a duty of confidentiality regarding physicians.